**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| P.G.,<br><br>Plaintiff,<br><br>v.<br><br>JEFFERSON COUNTY, NEW YORK; COLLEEN M. O'NEILL, as the Sheriff of Jefferson County, New York; BRIAN R. McDERMOTT, as the Undersheriff of Jefferson County; and MARK WILSON, as the Facility Administrator of Jefferson County Correctional Facility,<br><br>Defendants. | Case No. 5:21-cv-388 (DNH-ML)<br><br>**SECOND AMENDED AND** **<u>SUPPLEMENTAL COMPLAINT</u>** |

## PRELIMINARY STATEMENT

1. This civil rights action challenges Defendants' arbitrary and discriminatory denial of medically necessary treatment for opioid addiction at Jefferson County Correctional Facility.

2. For decades now, the opioid epidemic has devastated communities across this country. The loss of life has been staggering: more than half a million people dead in 20 years. Opioid addiction took the lives of 2,844 New Yorkers between June 2020 and June 2021—759 in the Northern District alone. That horror has worsened during the coronavirus pandemic. Today, one person in the United States dies of opioid overdose every 6.9 minutes.

3. Opioid addiction, or opioid use disorder ("OUD"), is a chronic brain disease that permanently rewires the brain for addiction, resulting in uncontrollable cravings for and use of opioids, no matter the consequences. People with OUD frequently overdose and die from opioid use.

4. The science is clear: The *only* effective treatment for this insidious disease is medication for opioid use disorder ("MOUD"), such as methadone. Broad consensus in the medical community confirms MOUD is the standard of care and necessary to treat opioid addiction. Other treatments—or no treatment at all—are perilous by comparison, as robust clinical data show.

5. But decades of entrenched stigma around opioid addiction have created systemic barriers to this life-saving treatment. And despite the scientific consensus about MOUD's vital role in recovery, opponents continue to labor under the myth that MOUD merely "replaces one addiction under another."

6. Trafficking in precisely this stigma, Defendants—Jefferson County and county officials who are responsible for the operations and oversight of the jail—have promulgated a categorical ban on providing methadone treatment to non-pregnant people at the jail, no matter the life-threatening consequences.

7. P.G. is a 36-year-old Watertown resident with severe OUD who is currently detained at the Jefferson County Correctional Facility. After a crushing, 16-year battle with addiction marked by cycles of remission and relapse, P.G. was finally sustaining active recovery from opioid addiction for the first time since he was 19 years old. Before his arrest, P.G. had a stable job; lived with his girlfriend of eight years, with whom he recently bought a home; and felt hopeful for the future for the first time in years. None of this would have been possible without the daily methadone treatment his physician prescribed.

8. But P.G.'s recovery from opioid addiction hangs in the balance, preserved only by a court order in this action that constrains Defendants from ending P.G.'s medically necessary care. Absent the preliminary injunction entered by this Court shortly after P.G.'s arrest, jail

officials will apply their blanket methadone ban to strip P.G. of his prescribed treatment, disregarding sound medicine, including the broad consensus in the scientific community and the express judgment of his treating physician.

9. But Defendants have sought to punish P.G. for seeking adequate medical care through this litigation. Defendants have kept P.G. in continuous solitary confinement since they took him into custody on September 2, 2021. In those five months, P.G. has been allowed out of his cell for only forty minutes every two days. Jail officers have said openly that P.G.'s extended segregation is punishment for his forcing the jail's hand on his treatment.

10. P.G. brings this action under the Americans with Disabilities Act, the United States Constitution, and state civil rights laws. He seeks declaratory and injunctive relief requiring Defendants to afford him continued access to methadone treatment while he is detained, free from Defendants' retaliation.

## PARTIES

11. Plaintiff P.G. is a 36-year-old man who resides in Watertown, New York. He has a disability, opioid use disorder, for which he is prescribed daily treatment with MOUD. At the time of the original filing of this action, Plaintiff P.G. faced imminent detention at the Jefferson County Correctional Facility. He has since been arrested by Defendants and remains detained in Defendants' custody at the Jefferson County Correctional Facility.

12. Defendant Jefferson County, New York, is a municipal corporation organized under the laws of the State of New York. The Jefferson County Sheriff's Office is an agency of Jefferson County and operates the jail.

13. Defendant Colleen M. O'Neill is the Sheriff of Jefferson County. As such, Defendant O'Neill is the legal custodian of all people confined to the jail and is responsible for

the safe, secure, and humane treatment of these residents, including their medical care. She has policymaking authority with regard to the jail. At all relevant times, Defendant O'Neill was acting under color of state law. Defendant O'Neill is sued in her official capacity.

14. Defendant Brian R. McDermott is the Undersheriff of Jefferson County. As such, he has control and supervision of all employees of the Jefferson County Sheriff's Office, including corrections officers and civilian employees, and has policymaking authority and oversight responsibilities with regard to the jail. He is also the direct supervisor of all Sheriff's Office administrative personnel, including the Jail Administrator. At all relevant times, Defendant McDermott was acting under color of state law. Defendant McDermott is sued in his official capacity.

15. Defendant Mark Wilson is a Lieutenant in the Jefferson County Sheriff's Office and Facility Administrator of the jail. As Facility Administrator, he is charged with running and has policymaking authority over the day-to-day operations of the jail, including its provision of medical care. His duties include all administrative functions of jail operations, including but not limited to supervising corrections officers and other staff, as well as overseeing detained people's health, care, safety, and discipline. He is fully familiar with the jail's policies, practices, procedures, and regulations. At all relevant times, Defendant Wilson was acting under color of state law. Defendant Wilson is sued in his official capacity.

## FACTUAL ALLEGATIONS

### A. Opioid Use Disorder Is a Life-Threatening Medical Condition and a Public Health Crisis.

16. Opioids are a class of drugs that inhibit pain and cause feelings of pleasure. Some opioids, such as oxycodone, have accepted medical uses, including managing severe or chronic

pain. Others, such as heroin, are illegal and not used in medicine in the United States. All opioids, including those prescribed for medical use, are highly addictive.

17. OUD is a chronic brain disease. Symptoms of OUD include uncontrollable cravings for and compulsive use of opioids, decreased sensitivity to opioids, and potentially excruciating withdrawal symptoms. OUD is progressive, meaning it often becomes more severe over time. Without effective treatment, patients with OUD are rarely able to control their use of opioids, often resulting in serious physical harm or premature death, including due to accidental overdose.

18. OUD breaks down the dopamine system necessary for the brain to feel a sense of normalcy and confidence in its own survival. People who are dopamine deficient have difficulty enjoying life activities and feeling normal, and experience feelings of depression, anxiety, and irritability. Brains that are addicted to opioids produce less than half the dopamine of non-addicted brains.

19. OUD permanently rewires the brain for addiction. People with OUD cannot simply "will" or "reason" their way out of continued opioid use, even when they are aware of the dire consequences. Continued use does not indicate a person lacks willpower, but rather is the predictable outcome of chemical changes in the brain that result in uncontrollable cravings.

20. Opioid addiction has thus proven especially unresponsive to non-medication-based treatment methods, such as abstinence-only and twelve-step programs, which have been popular in treating other addictions such as alcoholism.

21. Like other chronic diseases, OUD often involves cycles of relapse and remission. Rather than a linear progression in which a person attains abstinence from opioid use once-and-for-all, "successful" recovery for OUD is often characterized by sustained periods of abstinence

or "active recovery," punctuated by relapses in which the person returns to drug use. These relapses are frequently triggered by an increase in life stressors, a traumatic event, or a lapse in treatment, which causes the person to turn toward illicit drug use. The typical treatment goal for OUD is thus to maximize periods of active recovery and minimize periods of relapse, by ensuring continued treatment and encouraging the use of coping mechanisms and support systems.

22. OUD is an epidemic in the United States and a public health crisis. The incidence of OUD has skyrocketed since the late 1990s. Between 1999 and 2020, the number of annual opioid overdose deaths nationwide increased more than eightfold. Since 1999, more than 600,000 people in the United States have died from opioid overdose.




23. The current COVID-19 pandemic, which has produced enormous grief, anxiety, and feelings of isolation, has further accelerated these trends. In the one-year period ending April

2021, the opioid epidemic claimed more than 75,673 lives in the United States—up almost 35% from the previous year. Today, one person dies of opioid overdose every 6.9 minutes in this country.




24. The opioid epidemic has not spared New York. In this state, the number of annual opioid overdose deaths increased almost sixfold between 2000 and 2020. The Centers for Disease Control and Prevention ("CDC") estimate that 2,844 New Yorkers died of opioid overdose in the 12-month period preceding June 2021.

25. According to the New York State Department of Health ("DOH"), 759 people died of opioid overdose *in this judicial district alone* in the year-long period from June 2020 to June 2021.

26. Since 2013, the proliferation of fentanyl and other synthetic opioids—an extremely dangerous class of drug—has been the primary driver of the sharp rise in opioid

deaths. The CDC estimates that deaths from fentanyl and other synthetic opioids rose 36% from 2020 to 2021 alone. A lethal dose of fentanyl is a tiny fraction of a lethal dose of heroin, as demonstrated in the following figure.




27. Heroin and other illegal opioids are now commonly laced with fentanyl—often without the knowledge of the person using the opioids. As a result, people with OUD who use illegal opioids now face a heightened risk of being unwittingly exposed to lethal doses of fentanyl.

**B. Broad Scientific Consensus Confirms that MOUD Is Necessary to Treat OUD.**

28. As the opioid epidemic takes an ever-greater toll in the United States, medical science has provided hope by demonstrating that overdose deaths are preventable with effective treatment.

29. Broad consensus in the medical and scientific communities confirms that MOUD, also known as "medication for addiction treatment" or "MAT," are effective—and in fact

necessary—to treat OUD. The American Medical Association, the American Society of Addiction Medicine, the U.S. Department of Health and Human Services, the U.S. Food and Drug Administration ("FDA"), the National Institute on Drug Abuse, the Office of National Drug Control Policy, and the Substance Abuse and Mental Health Services Administration ("SAMHSA") have all endorsed the necessity of MOUD. SAMHSA has explained, "[J]ust as it is inadvisable to deny people with diabetes the medication they need to help manage their illness, it is also not sound medical practice to deny people with OUD access to FDA-approved medications for their illness."

30. New York State government health agencies have similarly embraced the importance of MOUD. DOH, the Office of Mental Health ("OMH"), and the Office of Addiction Services and Supports, all recognize MOUD as necessary to treat OUD. OMH has issued a letter to all state-licensed mental health clinics explaining that "MAT reduces overdose deaths, rates of [emergency department] visits and hospital stays, costs to payers and families, and improves quality of life with the potential for contribution to the community," and stating that clinics and hospitals "can contribute to mitigating the Opioid Epidemic" by "[o]ffering [MOUD] to all patients identified as having OUD."

31. The two most recent presidential administrations have also embraced the importance of MOUD. Under President Biden, SAMHSA has identified MOUD as "life-saving, evidence-based treatment" that "Americans with [OUD] need and deserve." And in November 2017, President Trump's Commission on Combating Drug Addiction and the Opioid Crisis likewise acknowledged the efficacy of MOUD and the need to expand its availability to patients.

32. Treatment with MOUD typically consists of medication combined with counseling and other behavioral therapies, but medication is the primary driver of efficacy.

MOUD decreases opioid use, reduces the risk of relapse and overdose death, and improves treatment retention. Treatment retention is crucial for treating OUD because the longer a patient stays in treatment, the less likely they are to relapse. Studies have shown that MOUD also decreases the likelihood of criminal activity and infectious disease transmission, and improves patients' ability to maintain positive family relationships and employment.

33. The FDA has approved three medications for treating OUD: methadone, buprenorphine, and naltrexone. Not all these medications are equally effective for every patient. Studies show that only two—methadone and buprenorphine—produce longer-term treatment retention, which is the key to effective MOUD treatment.

34. Methadone and buprenorphine are "agonists," which means they activate opioid receptors in the brain to relieve withdrawal symptoms and control cravings. Methadone is a "full agonist," meaning that it fully activates opioid receptors, resulting in a stronger opioid effect. Buprenorphine[1] is a "partial agonist," meaning that it partially activates opioid receptors.

35. The effect of both methadone and buprenorphine is much milder, steadier, and longer-lasting than drugs such as heroin, fentanyl, or oxycodone. Because methadone and buprenorphine bind to the opioid receptors they stimulate, they block the receptors from being stimulated by more powerful agonists—meaning that patients taking methadone and buprenorphine cannot get the same "high" from illicit drugs like heroin and fentanyl. This trains patients' brains to gradually decrease their response to and interest in opioids, in a process known as "extinction learning."

---

[1] Buprenorphine is frequently administered in a medication combined with naloxone, including under the brand name Suboxone.

36. Because they act on opioid receptors without presenting the same risk of overdose, both methadone and buprenorphine have been designated as “essential medicines” by the World Health Organization.

37. Naltrexone is an “antagonist,” which means it blocks opioid receptors without activating them, preventing the euphoric effect of opioids, and thus reducing desire for opioids over time. Naltrexone does not relieve withdrawal symptoms, and in fact can trigger acute and severe withdrawal. That withdrawal is especially severe when a patient has recently taken an opioid agonist or partial agonist. For that reason, medical standards require patients be fully withdrawn from opioids before receiving naltrexone—a process that requires not using opioids for anywhere from three to ten days.

38. Studies have shown that naltrexone treatment produces substantially poorer outcomes in terms of treatment retention than either methadone or buprenorphine. Treatment retention is crucial for MOUD because length of treatment is positively correlated with outcomes: The longer a patient stays in treatment the better the treatment outcome.

39. Because methadone and buprenorphine are better able than naltrexone to keep patients in treatment for longer periods, methadone and buprenorphine are the standard of care for OUD—particularly among patients with severe OUD.

40. Treatment with MOUD is necessarily individualized and depends on a patient’s unique profile. A patient may do well on any form of MOUD or find that only one provides effective treatment without significant adverse side effects. An MOUD that effectively treats one person may be completely ineffective, and thus dangerous, for another. SAMHSA has also highlighted that “dosing and schedules of pharmacotherapy must be individualized” for MOUD.

41. The severity of a patient's OUD is one factor that can inform the relative effectiveness of different forms of MOUD. A person with severe OUD may require a stronger MOUD, or a higher dosage, than a person with only mild OUD.

42. As SAMHSA has recognized, treatment for OUD—like treatment for other chronic diseases such as insulin for diabetes—is often lengthy and can require years or be lifelong. There is no maximum recommended duration for treatment with an MOUD.

43. Ending MOUD treatment prematurely is exceptionally dangerous. It triggers painful withdrawal symptoms that markedly increase the risk of relapse into opioid use, overdose, and death.

44. The symptoms of withdrawal from MOUD are crushing. They include bone and joint aches, nausea, vomiting, diarrhea, fever, excessive sweating, hypothermia, hypertension, tachycardia, depression, anxiety, dysphoria, and insomnia. These symptoms can last for weeks or months, and can lead to life-threatening complications—even apart from the risk of relapse and overdose—including pneumonia and fatal dehydration.

45. When treatment with MOUD must be discontinued, due to a patient's wishes or medical necessity, it is crucial to taper methadone and buprenorphine as slowly as possible to avoid severe withdrawal symptoms. That process of tapering often lasts several months, or even multiple years.

46. Forcing a person with OUD to withdraw from effective MOUD treatment, absent significant side effects or contraindications, violates the standard of care. And doing so abruptly heightens the risk of acute withdrawal and is even more dangerous.

47. Efforts to "medically manage" forced withdrawal or "detoxify" patients, with non-MOUD pain relievers or otherwise, are not meaningfully effective. Such efforts, also known

as detoxification, do not improve long-term outcomes for people with OUD. To the contrary, as SAMHSA confirms, "[p]atients who complete medically supervised withdrawal are at a risk of opioid overdose."

48. One study of treatment outcomes from a detoxification facility showed a 29% relapse rate on the day of discharge, a 60% relapse rate after one month, and a success rate of between only 5% and 10% after one year.

49. Forcibly changing a patient successfully using agonist medication, such as methadone, to an antagonist, such as naltrexone, is particularly inappropriate and dangerous because it requires subjecting the patient to severe withdrawal. In addition, because naltrexone has worse outcomes in terms of treatment retention, that change would place the patient at increased risk of relapse, overdose, and death. Finally, there would be no guarantee that the new treatment regimen would be effective, while the patient has already demonstrated success on agonist medication.

**C. Allowing Access to MOUD Is Particularly Important, and Is Feasible, In Carceral Settings.**

50. Providing MOUD is especially critical in carceral settings, where people with OUD face a dramatically heightened risk of relapse, overdose, and death in the weeks immediately following release.

51. A large proportion of incarcerated people have OUD. Approximately 80% of people in jails and prisons have a history of substance use, and 18.9% of sentenced people in local jails nationwide self-report that they regularly used opioids prior to incarceration.

52. One study concluded that incarcerated people are 12,900% as likely to die of drug overdose in the two weeks immediately following release as compared to the general public.

53. Access to MOUD plays a critical role in reducing death in incarcerated populations and yields positive results in the carceral setting.

54. As President Trump's Commission on Combating Drug Addiction and the Opioid Crisis concluded in 2017, treatment with MOUD is "correlated with reduced risk of mortality in the weeks following release" for people with OUD in jails and prisons.

55. One large study of individuals with OUD who were released from prison found that, in the first month after their release, those receiving MOUD were 75% less likely to die of any cause and 85% less likely to die of drug poisoning. Another study found that incarcerated people receiving MOUD agonist treatment were 94% less likely to die during their first four weeks of incarceration than those not receiving that treatment.

56. A study of the first year of the Rhode Island Department of Corrections' MOUD program found that 95% of individuals receiving MOUD continued treatment after their release. The program reduced post-release deaths by 60% and all opioid-related deaths in the state by more than 12%. In addition, because the program provided much needed treatment to people with OUD, the prevalence of illicit opioids in prison decreased.

57. Withholding MOUD without a clinical reason to do so is always dangerous but is especially so for incarcerated individuals with OUD, who are especially likely to relapse and die upon release.

58. Incarcerated individuals with OUD who are not provided with MOUD are nearly seven times as likely to die of drug poisoning in the first month after release than those who are given MOUD.

59. As both the National Commission on Correctional Health Care and the National Sheriffs' Association have recognized, "correctional withdrawal . . . actually increases the chances the person will overdose following community release due to loss of opioid tolerance."

60. The National Academy of Sciences, Engineering, and Medicine has observed that the "transition out of criminal justice settings is the time when users are most likely to overdose on opioids," and concluded that access to MOUD for incarcerated people is crucial to avoiding relapse, improving treatment retention, and lowering transmission of infectious diseases through illicit drug use.

61. Even when it does not lead to immediate overdose upon release, withholding MOUD from incarcerated people has a broadly destabilizing effect on treatment, leading to a 700% decrease in the likelihood of continuing MOUD after release from jail or prison.

62. Both the National Commission on Correctional Health Care and the National Sheriffs' Association have publicly recognized that "forced detoxification of prescribed opioid medication[] such as methadone can undermine an individual's willingness to engage in [MOUD] in the future, compromising the likelihood of long-term recovery."

63. As one study of Bronx patients published in the Journal of Substance Abuse Treatment found, forcible removal from methadone during incarceration led to "severe withdrawal," which "contributed to a subsequent aversion to methadone and adversely affected future decisions regarding engagement in [MOUD]."

64. Given the serious risks that OUD poses for incarcerated people, it is no surprise that an array of governmental authorities and medical and professional associations require or recommend that jails and prisons provide maintenance MOUD to those in their custody.

65. In recent years, the U.S. Department of Justice ("DOJ") has consistently taken the position that access to MOUD is required in both carceral settings and court programs. Repeatedly, DOJ has confirmed that MOUD is the standard of care for treatment of OUD and that denying access to MOUD can constitute unlawful disability discrimination.

66. In 2017, DOJ's Civil Rights Division launched the Opioid Initiative to enforce the ADA and work with U.S. Attorney's Offices nationwide "to ensure that people who have completed, or are participating in, treatment for OUD do not face unnecessary and discriminatory barriers to recovery."

67. That year, the U.S. Attorney for the Southern District of New York sent a 10-page letter to the New York State Attorney General, noting that MOUD "is a safe and widely accepted strategy for treating opioid disorders" with "broad support [] among medical and substance use experts," and instructing that "the Sullivan [County] family court and Sullivan surrogate's court should ensure that their policies and practices with respect to individuals participating in [MOUD] . . . are consistent with ADA requirements."

68. DOJ's Adult Drug Court Discretionary Grant Program, a grant program that provides financial and technical assistance to state and local drug court initiatives, also requires grantees to permit the use of MOUD.

69. In 2018, the U.S. Attorney for Massachusetts concluded "that all individuals in treatment for OUD, regardless of whether they are inmates or detainees, are already protected by the ADA, and [] the [Massachusetts Department of Correction] has existing obligations to accommodate this disability."

70. In January 2021, DOJ's Civil Rights Division issued a report concluding that the Cumberland County Jail in Bridgeton, New Jersey, had violated the Eighth and Fourteenth

Amendments to the U.S. Constitution by failing to provide MOUD to people in its custody. The report found that inadequate treatment of OUD presented a risk of serious harm and likely caused six of the jail's seven suicide deaths in the period studied. It also found that the jail had been deliberately indifferent to that risk by failing to prescribe MOUD, despite knowing people in its custody had significant heroin usage or obvious symptoms of opioid withdrawal.

71. The National Commission on Correctional Health Care and the National Sheriffs' Association have also come out strongly in favor of access to MOUD in jails and prisons, calling MOUD "a central component of the contemporary standard of care for the treatment of individuals with [OUD]," and concluding "all individuals with OUD should be considered for [MOUD]."

72. The American Society of Addiction Medicine, the leading professional society in the country on addiction medicine, also recommends treatment with MOUD for people with OUD in the criminal justice system.

73. And SAMHSA identifies making treatment available to criminal justice populations as one of the remaining challenges in fighting the opioid crisis.

74. Ensuring the robust access to MOUD treatment that these agencies and organizations support is both feasible in and beneficial to carceral settings.

75. In recommending expanded access in jails and prisons to MOUD, including methadone, both the National Commission on Correctional Health Care and the National Sheriffs' Association have emphasized that such access can "[c]ontribut[e] to the maintenance of a safe and secure facility for inmates and staff"; and reduce recidivism, withdrawal symptoms, the risk of post-release overdose and death, and disciplinary problems.

76. That recommendation is borne out by the experience of correctional administrators at facilities nationwide, including here in this judicial district.

77. After implementing a comprehensive MOUD program at the Albany County Correctional Facility in 2019—including access to agonist treatment for OUD with methadone and buprenorphine—Sheriff Craig Apple said of the program, "In the first three months, we saw a reduction in diversion and recidivism. And it was saving lives. It's a no-brainer."

78. And providing comprehensive access to treatment for MOUD with agonist therapy is strikingly inexpensive, even in facilities like the Albany jail, which have significantly greater populations than the Jefferson County Correctional Facility. According to Sheriff Apple, the cost of providing MOUD to the first 110 program participants at Albany County Correctional Facility was about $30,000—far cheaper than other medical care that jails routinely provide, such as cancer treatment and kidney dialysis.

79. In addition to Albany County Correctional Facility, numerous local jails around New York State provide access to agonist medication to treat people OUD.

80. Rikers Island has had an on-site opioid treatment program since 1987 where participants can receive methadone or buprenorphine while incarcerated, as well as connections to care upon release from jail and return to the community.

81. Clinton County Jail provides access to buprenorphine treatment to people in its custody.

82. Niagara County Jail provides methadone and buprenorphine to people who were receiving MOUD prior to their incarceration.

83. Saratoga County Jail has created a dedicated 31-cell pod for veterans with OUD, where they can receive methadone or buprenorphine.

84. Jails and prisons throughout the country also allow incarcerated individuals to continue with MOUD during incarceration. Examples include Bernalillo County Metropolitan Detention Center (New Mexico); Kings County Jail (Washington State); and Orange County Jail (Florida). The Rhode Island, Maine, and Vermont Departments of Corrections make MOUD available to all incarcerated people suffering from OUD throughout their entire sentence, even those who were not receiving MOUD before being incarcerated. And in November 2019, the federal Bureau of Prisons issued guidance requiring that all its facilities provide continuing MOUD to people in their custody if it is clinically appropriate.

85. Indeed, Defendants' own practice of providing methadone to pregnant people with OUD at the Jefferson County Correctional Facility demonstrates the feasibility of ensuring access to such treatment for P.G.

**D. Pervasive Stigma Towards People with OUD Functions as a Barrier to Effective Treatment.**

86. Despite the broad consensus among scientific experts and governmental authority that MOUD is efficacious and necessary, entrenched stigma towards OUD generally and MOUD specifically continues to obstruct access to these life-saving medications.

87. This stigma is grounded in longstanding and deeply rooted misconceptions that OUD is a choice and a moral failing. A nationwide poll found that 78% of Americans believed people who are addicted to prescription opioids are themselves to blame, and that 72% believed people addicted to prescription opioids lack self-discipline. News coverage of the opioid epidemic has often "reinforce[d] the widely-held notion . . . that addiction is the result of poor individual choices." These misconceptions persist even though OUD is a medical condition that permanently rewires the brain and renders it chemically dependent on opioids—a condition that millions of Americans of all backgrounds live with. As National Institute on Drug Abuse

Director Dr. Nora D. Volkow writes, stigma "is especially powerful in the context of substance use disorders. Even though medicine long ago reached the consensus that addiction is a complex brain disorder, those with addiction continue to be blamed for their condition."

88. Research confirms that stigma towards OUD is a formidable barrier to patients' accessing necessary treatment. As explained in an article published in the scientific journal Substance Abuse and Misuse, some continue inaccurately to regard MOUD as merely "substituting one drug for another"—equating the professional administration of an essential medicine with the use of illicit drugs. Another article published in the International Journal of Mental Health and Addiction notes that numerous public health studies have concluded that this stigma "is a major driver behind the lack of access to opioid agonist therapy," as well as a barrier to treatment retention and success.

89. These barriers are especially present in the criminal justice system, where "he false belief that the use of agonists or partial agonists just substitutes one addiction for another is prevalent and often causes jail and prison administrators to refuse to provide access to methadone and buprenorphine. As a group of experts representing medical institutions across the country recently lamented, the "undertreatment of people with OUDs who . . . have a history of involvement with the criminal justice system, often motivated by stigma, represents a missed public health opportunity given the well-established effectiveness of opioid agonist treatment."

90. People of color are particularly impacted by the barriers to MOUD access in jails and prisons because they face discrimination at each stage of the criminal legal system. For example, Black people are incarcerated for drug violations at nearly six times the rate of white people, despite comparable rates of drug use. And significant racial disparities in access to MOUD extend beyond the carceral system. For that reason, the denial of MOUD access in jails

and prisons disproportionately harms people of color—and the removal of barriers to MOUD access in carceral settings would particularly benefit treatment outcomes for people of color.

91. Because "stigma is a barrier to implementation of evidence-based policies and program to address the opioid crisis," medical and governmental authorities have identified combatting stigma as key to improving health outcomes for people with opioid addiction and, ultimately, to ending the opioid epidemic. Both the Department of Health and Human Services and the American Medical Association's Opioid Task Force have identified countering stigma as integral to addressing the opioid crisis. The National Institutes of Health has funded clinical interventions seeking to reduce the effect of stigma on care delivery to people with OUD. And former FDA Commissioner Dr. Scott Gottlieb underscored that the urgent work of "expand[ing] access to high-quality, effective medication-assisted treatments" to patients with OUD must include "countering the unfortunate stigma that's sometimes associated with their use."

**E. P.G. Is Diagnosed with Opioid Use Disorder for which Methadone Treatment Is Medically Necessary.**

92. P.G., who has been detained at the Jefferson County Jail on an alleged probation violation since September 2, 2021, is diagnosed with severe OUD. He has been addicted to opioids for over 16 years—almost his entire adult life.

93. Addiction runs in P.G.'s family. Research shows that genetic factors account for between 40% and 60% of a person's vulnerability to addiction. P.G.'s addiction to opioids is thus consistent with that reality.

94. P.G.'s use of opioids began in 2005 at age 19, when he was in college studying engineering. During his freshman year, some of his friends began recreationally using OxyContin pills, and offered them to him. Although P.G. thought it would be harmless to try OxyContin, he quickly became addicted, and realized he did not feel well if he went multiple

days without taking it — his heart raced, he sweated profusely, and he felt anxiety and unease. He became consumed by the desire to obtain more OxyContin and was unable to focus on his daily activities such as going to class. When the price of pills increased around 2008 and he could no longer afford them, his addiction caused him to turn to heroin because it was less expensive.

95. OUD has profoundly shaped the trajectory of P.G.'s life since he first began using opioids. As his addiction became more severe, P.G.'s life spiraled out of control: He dropped out of college, left his parents' home, and drifted from one friend's house to another.

96. P.G. is well-acquainted with the dangers associated with untreated OUD. More than ten of his high school classmates have died of an opioid overdose, including most of his close friends. A string of such deaths among P.G.'s former classmates occurred in or about 2014 and 2015, following the proliferation of fentanyl and other synthetic opioids.

97. P.G. himself overdosed in 2016 after being released from the Onondaga County Justice Center ("OCJC") in Syracuse, New York. Prior to his incarceration at OCJC, he had been receiving buprenorphine treatment and had reduced the frequency of his drug use significantly. At OCJC, P.G. was forcibly withdrawn from buprenorphine pursuant to the jail's then-ban on buprenorphine. (OCJC now provides MOUD, including methadone, to people in its custody.) After his release from OCJC, he continued to experience overwhelming opioid cravings and, a couple of weeks later, relapsed. P.G. remembers using drugs in his apartment and then suddenly awakening surrounded by police officers, who had administered lifesaving Narcan treatment.[2]

---

[2] Narcan is a brand name for naloxone nasal spray, which is an antagonist medication used to counteract the effect of opioids in individuals experiencing an opioid overdose.

Fortunately, his girlfriend was home at the time and was able to immediately call for medical assistance. He survived after being rushed in an ambulance to a hospital emergency room.

98. Like many people battling opioid addiction, P.G.'s path to recovery from OUD has been marked by a series of relapses and arrests.

99. Throughout his 16-year battle with addiction, P.G. has attempted many times to stop using opioids, including through treatment with each of the three FDA-approved medications and quitting "cold turkey." Besides methadone, each of these options has ultimately failed, resulting in P.G.'s repeatedly relapsing into opioid use.

100. P.G. has attempted treatment with buprenorphine repeatedly over the years. Despite some limited effectiveness initially, buprenorphine ultimately proved unsuccessful at treating P.G.'s OUD.

101. Initially, buprenorphine partially suppressed his opioid cravings and withdrawal symptoms, allowing him to decrease his drug use and take back some control of his life. Although P.G. continued to experience relapses, arrests, and incarceration, buprenorphine helped him sustain periods of recovery, community college attendance, and employment.

102. However, the effectiveness of buprenorphine for P.G. was limited and diminished over time. Buprenorphine reduced his cravings, but it did not eliminate them. While on buprenorphine, he was occasionally able to stop using heroin completely. More often, however, buprenorphine enabled P.G. to reduce but not eliminate his heroin usage. And the longer he took buprenorphine, the less effective it became. Toward the end of each course of treatment, P.G.'s opioid cravings and withdrawal symptoms returned in full force.

103. In 2018, even a relatively high dosage of buprenorphine did not effectively stop him from having strong opioid cravings and withdrawal symptoms, including body pains, insomnia, anxiety, body aches, and depression.

104. P.G. also tried naltrexone treatment briefly in 2016 and again in 2017, but it was even less effective for him than buprenorphine. It did not reduce his cravings or withdrawal symptoms at all. He felt like he was "white knuckling" his addiction: constantly fighting the urge to not use drugs and struggling to think about anything else. P.G. continued using heroin when on naltrexone and was unable to remain in treatment for more than a few months at a time.

105. In 2018, after hearing that some of his friends were successfully treating their OUD with methadone, P.G. sought to switch his treatment and began receiving daily methadone treatment at Conifer Park in Schenectady, New York. He later enrolled in methadone treatment closer to home at Credo Community Center, an MOUD provider in Watertown, New York. Upon P.G.'s intake at Credo, his treating physician diagnosed him with OUD and, after considering P.G.'s individual clinical profile and all available treatment options, determined that methadone therapy was the appropriate and necessary treatment.

106. P.G.'s treatment through Credo consists of a daily dose of methadone, group therapy, and individual counseling sessions.

107. P.G.'s treatment regimen at Credo is enabling him to sustain active recovery. He is no longer using illegal drugs and has had no significant adverse side effects from methadone treatment.

108. With methadone P.G. feels better than at any point since he first became addicted to opioids at 19 years old, and feels hopeful about the future for the first time in years. At the time he was taken into Defendants' custody, he had a stable job as a driver for a food delivery

service; was living with his girlfriend of eight years, C.H., with whom he recently bought a home; and enjoyed birdwatching on weekends.

109. None of this would have been possible without methadone treatment, and P.G.'s treating physician at Credo Center confirms methadone treatment is medically necessary for P.G. His treating physician also confirms that removing P.G. from methadone would be particularly dangerous and have a broadly destabilizing effect on P.G.'s recovery. Given P.G.'s clinical profile, his physician concludes that there is not an appropriate alternative treatment, and that without methadone, P.G. will experience severe withdrawal symptoms and opioid cravings, placing him at risk of relapse, overdose, and death.

### F. The Jail Maintains a Blanket Ban on Methadone Treatment for OUD, Without Regard to Medical Necessity

110. For years, Jefferson County has maintained a blanket policy or practice of denying methadone treatment for OUD to people in the jail's custody unless they are pregnant.

111. This blanket ban on methadone treatment not only permits but in fact *requires* that the jail deny methadone treatment to non-pregnant people, regardless of the consequences.

112. The result of the ban for people like P.G., who are receiving methadone treatment at the time they enter the jail's custody, is abrupt and forcible withdrawal from methadone.

113. P.G. was previously subjected to the jail's methadone ban, and forcibly removed from methadone treatment he had been receiving, when he was incarcerated at the jail for approximately six weeks in or about May and June 2019. Upon entry, P.G. informed the officer processing his intake that he was prescribed methadone and was receiving 125 mg per day. The officer responded with words to the effect of, "Well you won't be getting that here." P.G. also asked the nurse conducting his initial medical screening if he could continue receiving his prescribed methadone medication at the jail, to which the nurse responded no. Consistent with

Defendants' policy or practice, P.G. was then forcibly removed from his treatment pursuant to the jail's methadone ban, causing him to experience agonizing withdrawal for weeks, for which the jail provided no medication (MOUD or otherwise).

114. The jail's blanket methadone ban applies even if methadone has been prescribed by a physician as a medically necessary treatment for someone placed into the jail's custody.

115. The ban also strips the jail's medical staff of discretion to authorize methadone treatment, fully removing that treatment option without regard to medical necessity.

116. On information and belief, dozens of people with OUD pass through the jail's custody each year. Given the high incidence of OUD, particularly among people in jails and prisons, Defendants' methadone ban is applied on routine basis — on information and belief, several times each month — when jail officials decide what care to provide for people identified as having OUD or suffering from opioid withdrawal.

117. By contrast, Defendants maintain a policy of providing methadone treatment to pregnant people with OUD who are incarcerated at the jail. The jail does not have its own federally licensed Opioid Treatment Program, which would be required for the jail to provide methadone itself.

118. Instead, the jail offers that treatment through a contract with a third-party licensed methadone provider — Credo Community Center. The office where Credo provides methadone treatment to people in the jail's custody is located less than 1.5 miles from the jail, or about a five minute's driving distance.

119. Credo is the same clinic through which P.G. received methadone treatment prior to his current incarceration.

120. Defendants have never contracted with Credo to provide methadone treatment for non-pregnant people in the jail's custody.

121. On information and belief, Credo is willing and able to contract with Defendants to ensure that individuals with OUD in the jail's custody can receive prescribed methadone.

122. The jail's own policy documents reveal that Defendants' ban on methadone is not a product of ignorance. Quite the contrary, Defendants are aware of the importance of methadone to treat MOUD yet are unwilling to make it available to non-pregnant people with OUD at the jail.

123. The jail has a written policy of providing non-pregnant people with OUD with access to naltrexone treatment during the week prior to their release. This was the only methadone policy that the jail produced in response to a June 2019 freedom of information request by the New York Civil Liberties Union for records relating to the jail's provision of methadone to people in its custody — indicating that the jail does not provide methadone treatment other than to pregnant people. The written policy also recognizes that naltrexone "is contraindicated in patients that are actively using opioids."

124. The patient questionnaire for the jail's naltrexone program includes a question asking whether the patient has ever been prescribed buprenorphine or methadone, and "If Yes, was it helpful?" The jail is thus aware that methadone and buprenorphine are prescribed as treatment for people with OUD, and that such treatment may be beneficial.

125. The jail also has a policy requiring jail staff to maintain doses of Narcan nasal spray for the emergency treatment of incarcerated people experiencing an opioid overdose. The policy further provides for the training of correctional staff to administer Narcan to incarcerated people in the event of an overdose. The jail has a separate policy requiring incarcerated people

to receive an initial medical assessment upon admission, including an assessment of whether the patient is intoxicated or experiencing an overdose. Given that any opioid overdose experienced upon admission would be addressed by the initial medical assessment, the jail's policy for the maintenance and administration of Narcan reflects an understanding that people in its custody may access opioids and overdose during their incarceration.

126. The jail's written policies are issued by the Jail Administrator and require the signature and approval of the Sheriff and Undersheriff.

127. On information and belief, the jail requires approval of the Jail Administrator, Sheriff, and Undersheriff for the jail or any of its agents to provide people in its custody with a controlled substance that would otherwise be deemed contraband, such as methadone or buprenorphine for OUD.

**G. Defendants Refuse to Lift Their MOUD Ban, Prompting This Court's Preliminary Injunction Order.**

128. In the months leading up to his current detention, P.G. was terrified that the Jefferson County Jail would strip him of his methadone treatment because he had previously been subjected to the jail's ban on methadone.

129. When P.G. had been incarcerated at the jail for approximately six weeks in or about May and June 2019, he was forcibly removed from the prescribed methadone treatment he had been receiving. Upon entry, P.G. informed the officer processing his intake that he was prescribed methadone. The officer responded with words to the effect of, "Well you won't be getting that here." Consistent with Defendants' policy or practice, P.G. was then forcibly removed from his treatment pursuant to the jail's ban, causing him to experience agonizing withdrawal for weeks.

130. Fearing he would again be subject to the jail's methadone ban during his impending detention, P.G. made diligent efforts to alert Defendants to his disability and the dire consequences of having his methadone treatment interrupted. On April 2, 2021, counsel for P.G. sent a letter requesting that Defendants accommodate P.G.'s disability by affording him continued access to methadone treatment for OUD while he is in the jail's custody.

131. The accommodation request described the "constellation of severe withdrawal symptoms" and "markedly heightened risk of relapse and death" that would result from the Jail's allowing P.G.'s methadone treatment to lapse, and quoted the opinion of P.G.'s treating physician at Credo that discontinuing methadone therapy "would be particularly dangerous and is medically contraindicated." The request also attached a letter from the physician identifying daily methadone therapy as "medically necessary" and "the only effective means of treatment" for P.G's severe OUD.

132. The accommodation request asked Defendants to confirm by April 7, 2021 that Defendants would accommodate P.G.'s disability by permitting his daily treatment with methadone to continue during his detention at the Jail, and noted that Credo was "ready and able" to continue his treatment.

133. Defendants failed and refused to confirm by April 7, 2021 that they would grant P.G.'s accommodation request.

**H.** 134. Accordingly, P.G. filed the instant lawsuit seeking to secure continued access to his life-sustaining methadone treatment while he is in Defendants' custody.

**The Jail's Methadone Ban Harms P.G. Even Before His Arrest.**

135. Even before P.G. entered Defendants' custody, the jail's blanket methadone ban was interfering with his treatment and endangering his recovery.

136. Because Defendants refused to provide assurances that they would not cut off his treatment, P.G. made the painful decision to reduce his methadone dosage in the hopes of lessening the agony of forced withdrawal when he is ultimately removed from treatment at the jail. Instead of his therapeutic dosage of 140 mg per day, he took take a significantly lower dosage of between 30 to 60 mg per day.

137. Because the abrupt termination of MOUD treatment causes particularly intolerable withdrawal, it is not uncommon for MOUD patients facing incarceration to reluctantly reduce their dosage in an attempt to mitigate their suffering when they are forcibly removed from their medication at the jail or prison.

138. At his reduced dosage, P.G.'s withdrawal symptoms and opioid cravings were somewhat alleviated, but he was not able to go about his daily life without unrelenting thoughts about using opioids. Both he and his treatment providers recognized that maintaining such a subtherapeutic dosage was not sustainable in the long term.

## I. Defendants Retaliate Against P.G. By Isolating Him In Indefinite Solitary Confinement, Where He Remains Today.

139. Shortly after filing this lawsuit, P.G. moved the Court for a preliminary injunction prohibiting "Defendants, while [P.G.] is detained in their custody, from interrupting or otherwise denying [P.G.] continued access to methadone treatment as prescribed by his current treating physician;" and requiring "Defendants, while [P.G.] is detained in their custody, to ensure the provision of such treatment to [P.G.]."

140. Defendants vigorously opposed P.G.'s preliminary injunction motion. Defendants contested his need for methadone treatment and objected to providing it to P.G.

141. On September 7, 2021, the Court granted P.G.'s motion for a preliminary injunction in full, ordering Defendants to "provide [P.G.] with his daily prescribed methadone during his period of incarceration at the Jefferson County Jail."

142. Pursuant to the preliminary injunction order, Defendants have been transporting P.G. to the Credo Community Center in Watertown to receive his methadone doses on Mondays through Saturdays, except holidays; and to Crouse Hospital in Syracuse to receive his methadone doses on Sundays and holidays.

143. Nonetheless, Defendants continue to deny that they have any legal obligation—except under the Court's preliminary injunction—to provide methadone treatment to P.G. On information and belief, they still maintain that methadone is unnecessary, both for P.G. specifically and for the treatment of OUD generally.

144. Shortly after the Court's preliminary injunction order issued, jail officials placed P.G. in solitary confinement, where he remains as of this filing, almost five months later.

145. Throughout his months in solitary confinement, Defendants have isolated P.G. in a cramped cell, releasing him for just 40 minutes every 48 hours to shower and make short telephone calls, and for his MOUD treatment appointments.

146. The motive behind the jail's extended isolation of P.G. is clear. One jail official described P.G.'s isolation as a "punishment" for suing the jail. Another made a comment to the effect that being locked in isolation is a price P.G. is being made to pay for seeking to continue methadone treatment.

147. On September 23, 2021, P.G. filed an administrative grievance concerning his placement in solitary confinement.

148. In a letter dated November 18, 2021, a final denial of P.G.'s appeal of that grievance was issued.

149. Defendants have indicated that they will continue to isolate P.G. in this manner indefinitely—for as long as Defendants are required to transport P.G. for daily methadone dosing outside the jail.

150. At various points, Defendants, through counsel, have asserted that their placement of P.G. in indefinite solitary confinement is a necessary precaution to mitigate the risk of COVID-19 exposure associated with taking P.G. for his daily dosing appointments and Credo and Crouse.

151. Yet Credo and Crouse both maintain strict "no-contact" protocols for dosing MOUD patients to minimize the risk of COVID-19 transmission[3], and have confirmed they are willing and able to apply those protocols to P.G. Defendants know this but continue to hold P.G. in solitary confinement regardless.

152. Defendants do not require the corrections officers who accompany P.G. to his daily dosing appointments to quarantine, nor incarcerated people or jail staff who attend in-person court proceedings, where they come into contact with many more people than P.G. does during his clinic appointments

153. Despite P.G.'s repeated requests, through counsel, for the jail to end its retaliatory segregation of P.G., he remains in solitary confinement, his mental health deteriorating by the

---

[3] Credo and Crouse follow these protocols for patients who have tested positive for or have had confirmed exposure to COVID-19, reflecting that the protocols are sufficient to manage transmission risks even with confirmed COVID-19 cases.

day. Among other issues, he has experienced depression and anxiety, causing him to lose motivation and interest in most activities and rendering him incapable of focusing.

154. On February 1, 2022, Defendants' counsel confirmed that P.G.'s placement in solitary confinement would continue.

## JURISDICTION AND VENUE

155. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367; 42 U.S.C. § 1983; and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*

156. This Court has jurisdiction to issue declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and 42 U.S.C. § 12133; and injunctive relief pursuant to 42 U.S.C. § 12133 and Rule 65 of the Federal Rules of Civil Procedure.

157. Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b)(1), (b)(2).

## CLAIMS FOR RELIEF

### First Claim
### Violation of Title II of the Americans with Disabilities Act

158. Defendants' conduct as alleged in this Complaint violates Title II of the Americans with Disabilities Act.

### Second Claim
### Violation of the Fourteenth Amendment to the United States Constitution

159. Defendants' conduct as alleged in this Complaint violates the Fourteenth Amendment to the United States Constitution.

**Third Claim**
**Violation of the Eighth Amendment to the United States Constitution**

160. Defendants' conduct as alleged in this Complaint violates the Eighth Amendment to the United States Constitution.

**Fourth Claim**
**Violation of the First Amendment to the United States Constitution**

161. Defendants' conduct as alleged in this Complaint violates the First Amendment to the United States Constitution.

**Fifth Claim**
**Violation of New York State Civil Rights Law**

162. Defendants' conduct as alleged in this Complaint violates Section 40-c of the New York State Civil Rights Law.

163. P.G. has complied with the requirements of New York State Civil Rights Law § 40-d by serving notice of his Section 40-c claim on the New York State Attorney General.

**Sixth Claim**
**Violation of New York State Human Rights Law**

164. Defendants' conduct as alleged in the Complaint violates Section 296 of the New York State Human Rights Law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that the Court:

a. Assume jurisdiction over this action;

b. Declare that Defendants' conduct as alleged in the Complaint violates Plaintiff's rights under:

   i. Title II of the ADA;

   ii. The Fourteenth Amendment to the United States Constitution;

iii. The Eighth Amendment to the United States Constitution;

iv. The First Amendment to the United States Constitution;

v. Section 40-c of the New York State Civil Rights Law; and

vi. Section 296 of the New York State Human Rights Law;

c. Enjoin Defendants from:

i. Enforcing as to Plaintiff their ban on agonist medication prescribed for OUD;

ii. Interrupting Plaintiff's prescribed methadone treatment for OUD while he is detained in their custody;

iii. Retaliating against Plaintiff;

d. Issue an order enjoining Defendants to:

i. Ensure Plaintiff's continued access to his prescribed methadone treatment during his detention, including by creating a discharge plan to ensure continuity of treatment upon his release;

e. Award Plaintiff his reasonable attorney's fees and costs; and

f. Grant any further relief that the Court may deem just and proper.

Dated: March 23, 2022
New York, New York

Respectfully submitted,

NEW YORK CIVIL LIBERTIES UNION
FOUNDATION

*/s/ Antony P.F. Gemmell*
Antony P.F. Gemmell, #700911
Terry T. Ding, #702578
Molly K. Biklen, #515729
125 Broad Street, 19th Floor
New York, New York 10004

Telephone: 212-607-3300
Facsimile: 212-607-3318
agemmell@nyclu.org

AMERICAN CIVIL LIBERTIES UNION
NATIONAL PRISON PROJECT

/s/ Tammie Gregg
Tammie Gregg*
915 15th Street NW, 7th Floor
Washington, DC 20005
Telephone: 202-548-6602
Facsimile: 202-393-4931
tgregg@aclu.org

* Application for admission pro hac vice forthcoming

*Counsel for Plaintiff*